UNITED STATES DISTRICT COURT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

FOR THE DISTRICT OF VERMONT 2005 MAY 20 PM 2 15

CLERK

BY _____ *gws*
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA and<br>the STATE OF VERMONT,<br>     Plaintiffs,<br><br>     v.<br><br>DAVID S. CHASE,<br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. No.   **2:05-cv-136**

## COMPLAINT

Plaintiffs, the United States of America and the State of Vermont, allege as follows:

### I. PRELIMINARY STATEMENT

The United States and the State of Vermont seek redress under the False Claims Act, 31 U.S.C. § 3729, and common law for damages resulting from the Defendant David S. Chase's submission of false and wrongful claims for cataract surgery and secondary cataract surgeries. In sum, the United States and the State of Vermont contend that over a several year period Chase knowingly generated false records to support false claims he submitted to federally and state funded health programs for numerous cataract surgeries and secondary cataract surgeries.

### II. THE PARTIES

1.     Plaintiff United States of America is a sovereign entity. The United States brings this action principally on behalf of the United States Department of Health and Human Services (HHS), the Department of Defense (DOD), and the Office of Personnel Management (OPM).

2.     Plaintiff State of Vermont is a sovereign entity and joins in this on behalf of the Vermont Department of Children and Families of the Agency of Human Services.

3.     Defendant David Chase is an Ophthalmologist residing in Shelburne, Vermont.

Chase was a licensed, practicing ophthalmologist in Vermont who regularly performed cataract surgery and other eye surgery on his patients. He was the sole ophthalmologist for Vermont Associates in Ophthalmology, an unincorporated business, which maintained offices in the Mansfield Professional Building, 183 Saint Paul Street in Burlington, Vermont.

### III.   JURISDICTION AND VENUE

4.     This is a civil action to recover damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, and damages and interest under the common law of unjust enrichment, mistake of fact, and breach of contract. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. §§ 3732(b).

5.     Venue is appropriate in the District of Vermont because the Defendant  Chase resides and conducted business here and the transactions giving rise to the claims occurred here. 31 U.S.C. § 3732(a); 28 U.S.C. §§ 1391(b).

### IV. BACKGROUND ON THE FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS

### A.   The Medicare Program

6.     In 1965, Congress established the Medicare Program to provide health insurance for the elderly and disabled. The Medicare Program is administered through the United States Department of Health and Human Services (HHS) and, specifically, the Centers for Medicare and Medicaid Services (CMS), an agency of HHS (CMS was formerly known as the Health Care Financing Administration (HCFA)).

7.     Medicare is divided into two segments: Part A and Part B. Medicare Part A provides hospital insurance for eligible individuals. See 42 U.S.C. §§ 1395c-1395l. Medicare

-2-

Part A provides government payments to cover a hospital's costs for the hospitalization of its Medicare patients, or facility fees to out-patient surgical centers, such as the facility that Chase maintained in Burlington, Vermont.

8. In contrast, Medicare Part B is a supplemental medical insurance that provides coverage for medically necessary physician services and items other than hospitalization or surgical facility expenses. The Part B claim is separate and distinct from the hospital's Part A reimbursement of the patient's hospitalization costs.

9. Chase routinely submitted, or caused to be submitted, claims to Medicare Part A for his surgery facility fee, and to Medicare Part B for his physician services fee.

10. Medicare Part B pays eighty per cent of the allowed costs for "necessary" medical services such as physician visits. The patient is responsible for the remaining twenty per cent of the allowed cost.

11. Much of the daily administration and operation of the Medicare Part B Program is managed through private insurance companies that contract with the government. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.[1] The Medicare Carrier for the region which includes Vermont is the National Heritage Insurance Company (NHIC) based in Hingham, Massachusetts. NHIC also maintains an office in Williston, Vermont.

---

[1] Payments from the Medicare Program come from a trust fund–known as the Medicare Trust Fund–which is primarily funded through payroll deductions taken from the work force and Medicare B premiums paid by eligible beneficiaries. Over the last thirty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

-3-

12.     The majority of claims submitted by Chase to the Medicare Carrier are via electronic submission.  In order to become eligible for transmitting electronic claims to Medicare, providers, such as Chase, must agree to maintain certain documentation of the services billed, including medical records, for a period of six years.  In addition, the Medicare providers are required to submit only claims that are "accurate, complete, and truthful."

**B.     The Medicaid Program**

13.     The Medicaid program is a federally assisted grant program that enables states to provide medical assistance and related services to families with dependent children, the aged, the mentally infirm, the blind, and disabled individuals whose incomes and resources are insufficient to meet the costs of necessary medical services.  See 42 U.S.C. § 1396.  Medicaid is administered by the respective states and paid for by each state and the United States Government.  In Vermont the federal government subsidizes sixty per cent of the Medicaid program while the State of Vermont contributes the remaining forty per cent.  As a condition of participation in the Medicaid program, physicians are required to document all services in the medical records and maintain such documentation for six years.  The State of Vermont contracts with a company known as Electronic Data Systems, Inc. (EDS) to process Medicaid claims.  EDS maintains an office in Williston, Vermont.

**C.     TriCare – Department of Defense Medical Program**

14.     TriCare, formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), provides benefits for health care services furnished by civilian providers, physicians and suppliers to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members.  The program is

-4-

administered by the DOD and funded by the federal government.  TriCare has its own regulations

pertaining to covered services and provider requirements, many of which are similar to the

Medicare and Medicaid requirements.  See 32 C.F.R. § 199.4 (Basic Program Benefits).

      **D.**    **Federal Employees Health Benefits Program**

     15.    The Federal Employee Health Benefits Program (FEHBP) is administered through

the United States Office of Personnel Management (OPM).  This program provides health

insurance to federal employees, retirees, and their dependents by subsidizing participation in

private health plans for federal employees.  These health plans include Blue Cross Blue Shield

Federal and Mail Handlers Benefit Plan.

    **V.**  **BACKGROUND**

     16.    Chase's offices at the Mansfield Professional Building included a reception area,

examination rooms, staff offices, file rooms, and an outpatient surgical facility.  Chase's  surgical

facility included a surgery room, a recovery room, and equipment for performing eye surgery.

Chase was the sole doctor who used this facility for cataract surgery.

     17.    Chase employed a staff to assist in his ophthalmology and surgical practice.  The

staff included receptionists, technicians, nurses, billing and personnel staff, an optical manager,

and, at times, an optician.  The clinical staff, those responsible for providing medical care to

patients, were supervised by Chase.

      **A.**    **Diagnosis of Cataracts**

     18.    A cataract is the clouding of the natural lens of the eye that may effect a person's

vision.  The cause of a cataract and its rate of development are unique for each person.  During

the early stages of cataract development, there may be no perceptible effect on a person's vision.

Over time, the severity of a cataract may range from being a "trace" cataract with little or no effect on vision to being a "dense" cataract with significant effect on vision.

19.    A cataract is diagnosed from a comprehensive eye examination that includes, among other things, a patient's medical history, a patient's assessment of their own vision and visual needs, testing a patient's vision including any need for refractive correction, and a slit lamp microscopic examination of the patient's lens and other portions of the eye. A patient's medical history and vision are assessed by asking the patient questions prior to examination to understand their vision problems (if any) and their current visual needs.

20.    A patient's vision is generally tested by asking a patient to read a standardized letter chart (commonly known as a "Snellen chart"). A standard Snellen letter chart consists of rows of block letters (or symbols) in gradually decreasing sizes, and a patient is asked to read down the chart as many rows of letters as possible. A patient's vision is then recorded as a Snellen fraction: the first number represents the standard test distance (20 feet) and the second number represents the distance that a person with normal vision can see the letters on the Snellen chart. So, a person with 20/20 vision has normal vision. A person with 20/40 vision can only see the letters on the Snellen chart from 20 feet away that a person with normal vision can see standing 40 feet away. On this scale, a person with 20/50 vision is not permitted to drive in Vermont; a person with 20/200 vision is considered functionally blind.

21.    In many cases, a person's vision can be improved with refractive correction, either by wearing glasses, contact lenses, or other visual aids. The amount of refractive correction can be determined using automated equipment, manual equipment, or both. With automated equipment, a patient is asked to look into a computerized, electronic machine (commonly known

as an "auto refractor") that automatically assesses the patient's need for correction and

determines the corrected vision for the patient (the patient is asked to read a Snellen letter chart

inside the auto refractor with refractive correction).  The auto refractor then prints out a slip of

paper with the patient's refractive correction (commonly known as a "prescription") and his or

her corrected vision as a Snellen fraction (20/20, 20/30, 20/40, etc.).  With manual equipment, a

patient is asked to look through a series of optical lenses set in a machine (commonly known as a

"phoropter") at a standard Snellen letter chart and asked which lens gives the patient his or her

corrected vision.  A technician then records the prescription and the corrected vision in the

patient's medical chart.

        22.    A slit lamp is a special microscope that allows an ophthalmologist to look into a

patient's eye and examine the lens and other areas within a patient's eye.  Using a slit-lamp

examination, an ophthalmologist can see if the lens has any cloudiness and can identify if the

patient has a cataract, its type, and its severity.  There are several types of cataracts, including

nuclear, cortical, posterior subcapsular (known as "PSC"), and mixed, depending on the location

of the cloudiness within the lens.

        **B.**    **Treatment of Cataracts**

        23.    A cataract may or may not require surgery.  Treatment of a cataract depends on

the severity of the cataract, the patient's visual needs, and the patient's assessment of alternatives

to cataract surgery.  A cataract does not require surgery where a patient's vision meets his or her

visual needs for daily activities.  Where appropriate, a cataract should be treated with a new

prescription for glasses or contact lenses to restore acceptable vision for daily activities.  Where

correction cannot restore acceptable vision for daily activities, a cataract may be treated by

surgery.

24.     Cataract surgery is generally an elective procedure and the patient, not the

ophthalmologist, needs to make the decision to have surgery.  A patient should be advised of the

risks of surgery, the options to surgery (new glasses, contact lenses, or other visual aids), and the

elective nature of the surgery. Cataract surgery should not be performed where the patient does

not want surgery; where glasses, contact lenses, or visual aids provide vision that meets the

patient's needs; where the patient's quality of life is not compromised by the cataract; where

surgery will not improve the patient's vision; or where the patient is unfit for safe surgical

intervention.

25.     Cataract surgery is a procedure where an ophthalmologist removes a patient's

natural lens, which has lost its clarity, and replaces it with a synthetic, clear lens.  Cataract

surgery requires a patient to be anesthetized.  Incisions are then made into the eye, and a

specialized surgical instrument (called a "phacoemulsifier") is used to break down the patient's

natural lens, which is then removed with suction.  The new, synthetic lens (called an "intraocular

lens") is fitted into the patient's eye through the same incision.

## C.     Secondary Cataracts, Diagnosis and Treatment

26.     Following cataract surgery, a secondary cataract may develop in the back of the

capsule that holds the newly-implanted lens.  Over time, this secondary cataract may cause a

gradual decrease in visual function.  Secondary cataracts generally do not develop within the first

two months after surgery and may take up to five or ten years to develop.

27.     A secondary cataract, just like a cataract, is diagnosed as a result of a

comprehensive eye examination.  A secondary cataract may or may not be treated by surgery.  A

-8-

secondary cataract does not require surgery where a patient's vision meets their needs for daily activities. As with cataract surgery, a secondary cataract surgery is an elective procedure and the patient, not the ophthalmologist, needs to make the final decision to have surgery after being advised of the risks and complications of surgery.

28.     A secondary cataract surgery is performed with a YAG laser procedure. Using a non-invasive laser, an ophthalmologist can eliminate the cloudiness caused by the secondary cataract. The procedure only requires topical anesthesia and may take minutes to perform.

D.     **Billing Procedures**

29.     Chase submitted his claims for reimbursement to federally funded health care benefit programs on a standard Health Insurance Claim Form (known as a "HCFA-1500 form"), which described the dates of service, the procedure and services claimed, and the diagnosis justifying the claim. In submitting the HCFA-1500 form, Chase certified that "the services shown on this form were medically indicated and necessary for the health of the patient."

30.     At all times relevant to this Complaint, federally-funded health care programs, including Medicare, Medicaid, Tricare, BCBS Federal, and Mail Handlers, reimbursed physicians for services and procedures that were medically necessary. For example, under federal law, Medicare only reimburses for medical services that are "reasonable and necessary for the diagnosis or treatment of an illness or injury." In contracts with Medicare, Chase agreed to "abide by all Medicare laws, regulations and program instructions" and pledged that "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Chase also agreed to allow audits of all original source documents, including medical

-9-

records, supporting his claims and to maintain those documents for six years.  In contracts with other federally-funded health care benefit programs, Chase similarly agreed to receive reimbursement only for medically necessary services, to maintain medical records supporting his claims, and produce those medical records, if requested, for audits of his claims.

## VI.  THE SCHEME TO MAKE FALSE RECORDS AND SUBMIT FALSE CLAIMS

31.    It was part of the scheme to make false records and submit false claims that Chase offered, recommended, and performed cataract surgery and secondary cataract surgery that was not medically necessary.  Chase falsely diagnosed the severity of his patients' cataracts and secondary cataracts, often describing the cataracts and secondary cataracts as "dense" when, in fact, the severity of the cataracts was not "dense."

32.    Chase conducted and caused to be conducted misleading and fraudulent supplemental vision tests to support his diagnoses of cataracts and secondary cataracts.  Chase exaggerated and fabricated patient complaints about their vision and, at times, misrepresented their desire to have cataract surgery to support his diagnosis of cataracts and secondary cataracts.

33.    Chase recorded and directed others to record false, fraudulent, and misleading statements, test results, and diagnoses in his patient's medical charts to support his diagnoses of cataracts and secondary cataracts.   Chase destroyed and caused others to destroy results of certain medical tests and certain medical records that did not support his diagnoses of cataracts and secondary cataracts.

34.    Chase discouraged patients from seeking second opinions prior to surgery and did not fully advise patients of the alternatives to surgery.

35.    Chase submitted and directed others to submit claims to health care benefit

-10-

programs for reimbursement of medical services, including cataract surgery, secondary cataract surgery, and surgical facility fees, that were not medically necessary.

A.      **Chase's Diagnosis and Treatment of Cataracts**

36.      Chase exaggerated the severity of his patients' cataracts and told his patients that they needed cataract surgery when, in fact, the patient had no significant visual loss and no significant difficulty with their daily activities.  In general, Chase did not attempt to assess whether glasses, contact lenses, or other visual aids would provide corrected vision to meet his patients' needs for daily activities.  Chase often fraudulently diagnosed patients with normal vision (20/20 vision) as having a "dense" cataract that required surgery.  Chase often advised patients that they should have cataract surgery immediately and often did not review the alternatives to surgery with his patients.

37.      Chase exaggerated and fabricated patient complaints to support his diagnosis of cataracts.  At times, Chase would exaggerate or fabricate patient complaints about driving in difficult lighting conditions, such as facing oncoming headlights at night or in the rain, and record or cause those exaggerated or created complaints to be recorded in a patient's medical record.  At times, Chase misrepresented his patient's desire to have cataract surgery by writing or causing to be written in their medical record that the patient "wants cataracts removed" or "wants cataracts removed ASAP" when, in fact, the patient had not yet agreed to the surgery or did not want surgery at all.

38.      Chase discouraged his patients from getting a second opinion for his recommendation of cataract surgery.  At times, Chase advised patients that he, not another doctor, would give the patient a second opinion.  Chase advised patients that if they went to

-11-

another doctor, the other doctor would not see the cataracts because they did not have the expertise and qualifications of Chase. In his "second opinion," Chase would then recommend cataract surgery for his patients a second time. Chase directed his staff to record in the patient's medical chart that the patient had been "given a 2nd opinion."

39.     Chase misrepresented his medical qualifications and certifications to encourage patients to have cataract surgery and discourage them from seeking a second opinion. At times, Chase misled his patients to believe that he was the only surgeon in Vermont certified to do cataract surgery.

40.     At all times relevant to this Complaint, Chase directed his staff to maintain a schedule of performing nine cataract surgeries every week, regardless of the number of patients he examined. Chase expressed anger with his staff if he did not have nine surgeries scheduled for the upcoming week. At times, when his schedule was not full, Chase would himself contact patients if they elected not to undergo surgery or wanted to wait to have surgery, and Chase attempted to convince his patients to have surgery as soon as possible in order to fill his schedule.

41.     From in or about July 2002 to July 2003, Chase performed cataract surgeries on more than 210 of his patients. For approximately 30 percent of those surgeries, the patients had corrected vision of 20/20 or better in their eye prior to surgery. For approximately 50 percent of those surgeries, the patients had corrected vision of 20/30 or better in their eye prior to surgery. With limited exceptions, standard medical practice does not support the need for cataract surgery unless a patient's corrected vision is 20/40 or worse.

-12-

B.    **Chase's Supplemental Vision Tests**

42.    At all times relevant to this Complaint, Chase used supplemental vision tests to support his diagnosis of cataracts and his recommendation for cataract surgery. Among other things, these supplemental vision tests were conducted contrary to standard medical practice, had the effect of making a patient's vision appear to be significantly worse than it was, and were used by Chase to support his fraudulent diagnosis of cataracts.

i.    **Brightness Acuity Testing**

43.    Beginning in or about October 1996 and continuing until in or about July 2003, Chase directed and trained his staff to conduct brightness acuity testing on all patients over 45 who had not previously had cataract surgery and to record the results of the tests contrary to standard medical practice.

44.    Brightness acuity testing is designed to assess a patient's vision under various light conditions and is administered by using the Brightness Acuity Tester (BAT). The BAT is a handheld instrument with a cup that fits over the eye and can be illuminated by a light of varying intensity. The patient is directed to look through the hole in the cup on the BAT and read the letters from a standard Snellen letter chart.

45.    The BAT has three light settings: low, medium, and high. The "low" setting approximates bright overhead fluorescent lighting, the "medium" setting approximates indirect sunlight while outdoors, and the "high" setting approximates direct, overhead sunlight while outdoors. The intensity of the "high" setting is four times that of the "medium" setting, and more than 30 times greater than the "low" setting.

46.    The instructions for the BAT direct that a patient be tested with their glasses or

-13-

contact lenses (if needed) in place, at first with the light in the BAT turned off.  Then, the patient should be tested with the BAT set to the "low" light setting, then set to the "medium" light setting, and then set to the "high" light setting.  With each setting, the patient should be given approximately 30 seconds to allow their eye to adjust to the light intensity before reading from the Snellen chart.  The results of the BAT at each setting should be recorded in the patient's medical chart, and the results should be clearly marked as being done with the BAT.

47.     At all times relevant to the Complaint, Chase directed and trained his staff to only use the BAT with the "high" light setting, contrary to the BAT instructions and standard medical practice, and to record results from BAT with no notation of the light setting used, contrary to standard medical practice.  At times, Chase also directed and trained his staff to conduct testing with the BAT on the "high" light setting after a patient's eyes were dilated, contrary to standard medical practice.  Furthermore, Chase always used the BAT in conjunction with contrast sensitivity testing.

### ii.     Contrast Sensitivity Testing (CST)

48.     From in or about October 1996 and continuing until in or about July 2003, Chase directed and trained his staff to conduct contrast sensitivity testing (CST) in conjunction with the BAT on all patients over 45 who had not previously had cataract surgery and record the results of CST with the BAT contrary to standard medical practice.

49.     Contrast sensitivity testing (CST) is designed to test a patient's ability to see varying degrees of contrast, and Chase used the Vector Vision CSV-1000 test for CST.  The CSV-1000 test is administered in two phases.  First, the patient is asked to look at a letter chart, similar to a standard Snellen letter chart, and asked to read rows of letters which get smaller and

-14-

smaller as the patient reads down the chart. Unlike a standard Snellen letter chart, however, the

CSV-1000 test had sets of letters with three, varying degrees of contrast: one with 100 percent

contrast (black letters), one with 25 percent contrast (gray letters), and one with 12.5 percent

contrast (light gray letters). Second, the patient is asked to look at two rows of small circles with

lines that appear as fuzzy gray bars. The width and clarity of the bars within the circles change as

the patient reads across the chart, and the patient is asked to say whether the bars are in the upper

or lower circle in each row. According to its instructions, when conducting CST with the BAT,

the CSV-1000 test is to be administered first without the BAT and then with the BAT. To

evaluate the test, the results from the CSV-1000 test with the BAT are then compared to the test

results without the BAT.

50.     At all times relevant to the Complaint, Chase directed and trained his staff to

conduct the first and second phases of the CSV-1000 test only while looking through the BAT on

the "high" light setting, contrary to test instructions and standard medical practice. Chase also

directed and trained his staff to conduct the first phase of the CSV-1000 test only using the

lowest contrast letters (12.5 percent) on the Snellen chart. Following these procedures, the test

results from CST with the BAT set on the "high" light setting made a patient's vision appear to be

significantly worse than it was.

## C.     Chase's False Recording of Test Results

51.     From in or about October 1996 and continuing until in or about August 2002, for

any patient over 45 who had not had cataract surgery, Chase directed and trained his staff to write

the test results from the standard Snellen letter test on a yellow "sticky" note or slip of paper that

could be removed from the patient's medical chart.

-15-

52.    Chase directed and trained his staff to record CST with the BAT test results in place of the standard Snellen letter test results in a patient's medical chart under the heading "1. Vision" with no notation that it was, in fact, CST with the BAT test results. Then, after testing by his staff, Chase would review a patient's medical chart, read the results of the standard Snellen letter test on the "sticky" note or slip of paper, and would destroy or cause others to destroy the "sticky" note or slip of paper with the results of the standard Snellen letter test. As a result, a patient's vision in their medical chart under the heading "1. Vision" would appear to be significantly worse than it was.

53.    Beginning in or about August 2002 and continuing until in or about July 2003, for any patient over 45 who had not had cataract surgery, Chase directed and trained his staff to record the test results both from the standard Snellen letter test and from CST with the BAT on the yellow "sticky" note or slip of paper that could be removed from the medical chart, leaving a portion of the patient's medical chart blank. After testing by his staff and during his review of the chart, Chase then personally wrote the test results from CST with the BAT in place of results from the standard Snellen letter test under the heading "1. Vision" in the patient's medical chart. Chase continued to destroy or direct others to destroy the "sticky" note or slip of paper with the results of the standard Snellen letter test and CST with the BAT.

54.    At least one member of the staff raised concerns to both Chase and his wife Brianne Chase about Chase's practice of writing testing results on yellow sticky notes. These concerns were ignored.

**D.    Chase's Diagnosis and Treatment of Secondary Cataracts**

55.    At various times relevant to the Complaint, Chase exaggerated the severity of his

-16-

patients' secondary cataracts and told his patients that they needed secondary cataract surgery, when, in fact, the patient had no significant visual loss and no difficulty with their daily activities. Chase routinely advised patients that they should have secondary cataract surgery immediately, often on the same day of his diagnosis. Chase often exaggerated and fabricated patient complaints to support his diagnosis and, at times, misrepresented patient's desire to have the surgery. Chase directed and trained his staff to conduct CST with the BAT, as described in paragraphs 42 through 49 above, in order to justify his diagnosis of secondary cataracts, and he regularly submitted claims to federally funded health care benefit programs using these fraudulent test results to justify secondary cataract surgery.

56.    From January 2002 to July 2003, Chase performed secondary cataract surgery on approximately 75 percent of his patients who had cataract surgery in 2002, often performing secondary cataract surgery less than two months from the initial surgery. With limited exceptions, standard medical practice usually requires secondary cataract surgery on 40 percent or less of cataract surgery patients over several years.

## COUNTS ONE THROUGH EIGHTY-NINE (FALSE CLAIMS ACT)

57.    Counts one through ninety-one hundred four incorporate paragraphs 1- 56 of this complaint.

58.    The False Claims Act, 31 U.S.C. 3729(a)(1) imposes liability for treble damages and civil penalties on any person who knowingly presents or causes to present false or fraudulent claims to the United States.  In addition, the False Claims Act imposes liability on any person who knowingly makes or causes to be made a false record to get a false or fraudulent claim paid by the Government.  31 U.S.C. § 3729(a)(1).  To act "knowingly" under the False Claims Act, a person must either: (1) have actual knowledge of the information; (2) act in deliberate ignorance of the truth or falsity of the information; or (3) act in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b).

59.    The claims set forth in counts one through ninety each constitute false claims that Chase knowingly submitted, or caused to be submitted, for the date of service indicated.  Each count also delineates false statements Chase knowingly made to get the false claims paid and thus separately violates the False Claims Act, 31 U.S.C. § 3729(a)(2).[2]  This list of specific claims is illustrative of the false claims submitted by Chase from 1996 through 2003, but it is by no means inclusive or exhaustive of all such false claims submitted by Chase.

---

[2] The delineated counts usually involved two false claims (or more) per surgery pursuant to 31 U.S.C. § 3729(a) because Chase would separately submit claims for the surgery fee and another false claim for the surgical facility fee.

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|-------|------------------|------------------------------|-----------------|------------|-------------|------------------|
| 1 | J.S. | Cataract Extraction -OD[3] | 7/14/03 | Mail Handlers | $1,540.02 | (1) vision 20/100 OD & 20/100 OS; (2) dense central nuclear cortical cataracts; (3) unable to see clearly to drive in glare nightime. |
| 2 | T.M. | Cataract Extraction -OD | 4/22/03 | Federal BC/BS | $1,057.50 | (1) can't see to drive safely in glare conditions at night, wants cataracts removed; (2) dense central nuclear cortical cataracts |
| 3 | M.L. | YAG -OS | 6/14/01 | Federal BC/BS | $1,019.58 | (1) dense central capsular opacity OS; (2) has decreased visual acuity from secondary cataract. |
| 4 | N.L. | Cataract Extraction -OD | 7/1/03 | Medicare | $1,300.99 | (1) can't see to drive safely at night due to glare, 2nd to cataracts & retinal surgeon recommend cataract surgery; (2) vision 20/50 OD & 20/100 OS; (3) dense central nuclear cortical cataracts pp sub caps cataracts |
| 5 | N.L. | Cataract Extraction -OS | 7/8/03 | Medicare | $1,300.99 | (1) vision 20/100 OS; (2) still decreased reading and driving visual acuity from cataracts; (3) dense central nuclear cortical cataracts. |
| 6 | W.D. | Cataract Extraction -OS | 3/4/03 | Medicare | $1,438.78 | (1)has decreased visual acuity distance for working around the house due to cataracts, wants cataracts removed, can't see to paint indoors; (2) vision 20/100 OD & 20/100 OS; (3) dense central nuclear cortical cataracts |
| 7 | W.D. | Cataract Extraction -OD | 3/25/03 | Medicare | $1,438.78 | (1) has decreased reading & driving visual acuity OD from cataract wants cataract removed ASAP; (2) vision 20/100 OD |
| 8 | W.D. | YAG Surgery -OS | 6/16/03 | Medicare | $165.79 | (1) has decreased driving & reading visual acuity since last exam due to 2nd cataracts, wants 2nd cataracts removed |
| 9 | W.D. | YAG Surgery -OD | 7/3/03 | Medicare | $524.68 | (1) still has decreased reading & driving visual acuity OD from 2nd cataract, wants 2nd cataract removed OD |
| 10 | R.C | YAG Surgery -OD | 5/13/02 | Medicare /Tricare | $597.83 | (1) OD-OS visual acuity decreased, increased glare from secondary cataracts, wants removed; (2) vision 20/100 OD & 20/100 OS |

---

[3] "OS" is a standard ophthalmology abbreviation for left eye and "OD" refers to right eye. "OU" refers to both eyes.

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|---|---|---|---|---|---|---|
| 11 | R.C. | YAG Surgery -OS | 5/20/02 | Medicare /Tricare | $597.83 | (1) still has decreased visual acuity OS from secondary cataract wants removed; (2) vision 20/20 OD & 20/100 OS |
| 12 | D.M. | YAG Surgery -OS | 1/13/03 | Medicare | $444.02 | (1) has decreased driving & reading visual acuity since last visit due to secondary cataracts, wants cataract removed |
| 13 | D.M. | YAG Surgery -OD | 2/10/03 | Medicare | $524.02 | (1) has decreased reading & driviing visual acuity OD from secondary cataract, wants secondary cataract removed |
| 14 | A.B. | Cataract Extraction -OD | 2/11/03 | Medicare | $1,298.38 | (1) can't see to drive safely at night due to cataracts, wants cataracts removed; (2) vision 20/70 OD & 20/70 OS; (3) dense central nuclear cortical cataracts |
| 15 | A.B. | Cataract Extraction -OS | 2/25/03 | Medicare | $1,298.38 | (1) still has decreased visual acuity driving and reading due to cataract OS, eyes out of balance.  wants cataract removed OS ASAP; (2) dense central nuclear cortical cataracts |
| 16 | A.B. | YAG Surgery -OD | 5/16/03 | Medicare | $523.23 | (1) has decreased visual acuity reading and driving since last exam due to secondary cataracts, wants secondary cataracts removed |
| 17 | A.B. | YAG Surgery -OS | 5/23/03 | Medicare | $523.23 | (1) has decreased driving and reading visual acuity from secondary cataract OS. Wants secondary cataract removed ASAP; (2) vision 20/20 OS & 20/40 OD |
| 18 | P.B. | Cataract Extraction -OD | 2/25/03 | Medicare | $1,299.24 | (1) can't see to drive safely in glare due to glare, wants cataracts removed; (2) vision 20/70 OD & 20/100; (3) dense central nuclear cortical cataracts |
| 19 | P.B. | Cataract Extraction -OS | 3/4/03 | Medicare | $1,299.24 | (1) has decreased visual acuity driving and reading from cataract wants cataract removed ASAP; (2) vision 20/25 OD & 20/100 OS; (3) dense central nuclear cortical cataracts |
| 20 | P.B. | YAG Surgery -OD | 5/8/03 | Medicare | $523.23 | (1) has decreased reading & driving visual acuity since last visit due to secondary cataracts, wants secondary cataracts removed; (2) vision 20/50 OD & 20/50 OS |
| 21 | P.B. | YAG Surgery -OS | 5/28/03 | Medicare | $523.23 | (1) still has decreased reading & driving visual acuity OS due to secondary cataract, wants secondary cataract removed; (2) vision 20/20 OD & 20/50 OS |
| 22 | R.C.2 | Cataract Extraction -OD | 3/4/03 | Medicare | $1,299.24 | (1) can't see to drive safely at night due to cataracts wants cataracts removed.  Has decreased reading due to cataracts; (2) vision 20/100 OD & 20/70 OS; (3) dense central nuclear cortical cataracts |

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|---|---|---|---|---|---|---|
| 23 | R.C.2 | Cataract Extraction -OS | 3/18/03 | Medicare | $1,299.24 | (1) has decreased driving & reading visual acuity OS from cataract.  Wants cataract removed OS ASAP; (2) vision 20/20 OD & 20/70 OS; (3) dense central nuclear cortical cataracts |
| 24 | R.C.2 | YAG Surgery -OS | 7/3/03 | Medicare | $524.68 | (1) has had decreased visual acuity OS from 2nd cataract for reading & driving since last exam, wants 2nd cataract removed; (2) dense central capsular opacity OS |
| 25 | S.K. | Cataract Extraction -OS | 2/20/01 | Medicare /Tricare | $1,345.51 | (1) not seeing clearly to read, interferes with life, wants cataracts removed; (2) vision 20/25 OD & 20/25 OS; (3) dense central nuclear cortical cataracts |
| 26 | S.K. | Cataract Extraction -OD | 2/27/01 | Medicare /Tricare | $1,345.51 | (1) OD still blurred from cataract, eyes out of balance, wants cataract removed ASAP; (2) vision 20/50 OD; (3) dense central nuclear cortical cataracts |
| 27 | S.K. | YAG Surgery -OS | 9/10/01 | Medicare /Tricare | $516.39 | (1) has increased glare from 2nd cataract, this interferes with vision, wants 2nd cataract removed; (2) dense central capsular opacity |
| 28 | S.K. | YAG Surgery -OD | 6/28/02 | Medicare /Tricare | $654.15 | (1) has decreased visual acuity OD from 2nd cataract wants 2nd cataract removed. This interferes with binocular vision; (2) dense central capsular opacity |
| 29 | F.T. | Cataract Extraction -OD | 3/20/01 | Medicare /Tricare | $1,345.51 | (1) vision 20/100 OD & 20/80 OS; (2) dense central nuclear cortical cataracts |
| 30 | F.T. | Cataract Extraction -OS | 4/3/01 | Medicare /Tricare | $1,345.51 | (1) vision 20/30 OD & 20/80 OS; (2) dense central nuclear cortical cataracts |
| 31 | F.T. | YAG Surgery -OD | 8/16/01 | Medicare /Tricare | $516.39 | (1) has decreased visual acuity & increased glare from 2nd cataracts, wants 2nd cataract removed OD; (2) vision 20/80-1 OD & 20/80-1 OS; (3)  dense central capsular opacity |
| 32 | F.T. | YAG Surgery -OS | 8/30/01 | Medicare /Tricare | $516.39 | (1) still has decreased visual acuity OS from 2nd cataract, wants 2nd cataract removed OS; (2) vision 20/100 OS; (3) dense central capsular opacity |
| 33 | M.H. | Cataract Extraction -OD | 10/15/02 | Medicare /Tricare | $1,493.27 | (1) can't see to drive safely in glare wants cataracts removed; (2) vision 20/100 OD & 20/100 OS; |
| 34 | M.H. | Cataract Extraction -OS | 11/5/02 | Medicare /Tricare | $974.47 | (1) has decreased visual acuity near & far OS from cataract wants cataract removed; (2) vision 20/60 OD & 20/200 OS |

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|---|---|---|---|---|---|---|
| 35 | M.H. | YAG Surgery -OS | 1/6/03 | Medicare /Tricare | $536.16 | (1) has decreased visual acuity reading & driving from 2nd cataracts, want 2nd cataracts removed; (2) dense central capsular opacity |
| 36 | M.H. | YAG Surgery -OD | 1/27/03 | Medicare /Tricare | $732.24 | (1) has decreased visual acuity OD in distance & reading from 2nd cataract. Wants 2nd cataract removed ASAP; (2) dense central capsular opacity OD |
| 37 | D.S. | Cataract Extraction -OD | 1/21/03 | Medicare | $1,298.38 | (1) decreased driving & reading visual acuity 2nd to cataracts.  Wants cataract surgery ASAP; (2) vision 20/70 OD & 20/70 OS; (3) dense central nuclear cortical cataracts |
| 38 | D.S. | Cataract Extraction -OS | 1/28/03 | Medicare | $1,298.38 | (1) has decreased visual acuity distances & near from cataract OS.  Wants cataract OS removed ASAP; (2) vision 20/70 OS; (3) dense central nuclear cortical cataracts |
| 39 | P.S. | Cataract Extraction -OD | 10/29/02 | Medicare | $1,250.51 | (1) can't see clearly to read 2nd to cataracts, wants cataracts removed; (2) vision 20/100-1 OD & 20/100-1 OS; (3) dense central nuclear cortical cataracts |
| 40 | P.S. | YAG Surgery -OD | 11/21/02 | Medicare | $474.04 | (1) patient wants to come in this week to have secondary cataract OD removed; (2) secondary cataract OD. |
| 41 | R.P. | YAG Surgery -OD | 12/6/02 | Medicare | $524.02 | (1) has decreased visual acuity in distance & for reading due to 2nd cataract, wants 2nd removed |
| 42 | R.P. | YAG Surgery -OS | 12/13/02 | Medicare | $524.02 | (1) has decreased visual acuity driving & reading OS from 2nd cataract; (2) vision 20/70 OS; (3) dense central capsular opacity OS. |
| 43 | M.P. | YAG Surgery -OD | 1/30/03 | Medicare | $444.02 | (1) can't see to drive & read clearly due to 2nd cataracts, wants 2nd cataract removed; (2) dense central capsular opacity OU. |
| 44 | M.P. | YAG Surgery -OS | 2/6/03 | Medicare | $524.02 | (1) has decreased visual acuity for driving & reading due to secondary cataract, wants secondary cataract removed; (2) dense central capsular opacity OU |
| 45 | M.D. | Cataract Extraction - OS | 5/13/03 | Medicare | $1,299.24 | (1) still has decreased driving and reading visual acuity due to cataract OS, eyes out of balance, wants cataract removed OS ASAP; (2) vision 20/70 OS; (3) dense central nuclear cortical cataracts |

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|---|---|---|---|---|---|---|
| 46 | B.F. | Cataract Extraction -OS | 5/24/01 | Medicaid | $1,917.29 | (1) not able to see clearly, 2nd to cataracts, interferes with life, wants cataracts removed. Can't drive in sun 2nd to glare; (2) vision 20/100-1 OD & 20/80 OS |
| 47 | B.F. | Cataract Extraction -OD | 6/5/01 | Medicaid | $1,917.29 | (1) OD still blurred from cataract, eyes out of balance, wants cataract surgery OD ASAP; (2) vision 20/100 |
| 48 | B.F. | YAG Surgery -OD | 10/12/01 | Medicaid | $893.03 | (1) has decreased visual acuity from secondary cataracts, wants secondary cataracts removed; (2) dense central capsular opacity |
| 49 | B.F. | YAG Surgery -OS | 11/1/01 | Medicaid | $893.03 | (1) still has decreased visual acuity OS from secondary cataract, wants secondary cataract removed; (2) dense central capsular opacity. |
| 50 | D.G. | Cataract Extraction -OD | 9/14/99 | Medicare | $596.09 | (1) blurred visual acuity OD interferes with binocular visual acuity wants cataracts removed; (2) dense central nuclear sub capsular cataract OD. |
| 51 | D.G. | Cataract Extraction -OS | 3/4/03 | Medicare | $1,299.24 | (1) has decreased visual acuity driving; (2) dense central nuclear cortical cataract OS |
| 52 | D.G. | YAG Surgery -OD | 9/27/99 | Medicare | $100.45 | (1) has decreased visual acuity from 2nd cataract wants 2nd cataract removed; (2) dense central capsular opacity OD |
| 53 | D.G. | YAG Surgery -OS | 3/27/03 | Medicare | $473.50 | (1) OS has decreased visual acuity for reading & TV since last visit, wants OS 2nd cataract removed; (2) dense central capsular opacity OS |
| 54 | C.B. | Cataract Extraction -OS | 11/5/02 | Medicare | $780.22 | (1) vision 20/60 OD & 20/25 OS; (2) dense central nuclear cortical cataracts |
| 55 | C.B. | Cataract Extraction -OD | 11/12/02 | Medicare | $780.22 | (1) vision 20/100 OD & 20/70 OS; (2) dense central nuclear cortical cataracts |
| 56 | C.B. | YAG Surgery -OD | 2/20/03 | Medicare | $524.02 | (1) has decreased driving & reading visual acuity from 2nd cataracts wants 2nd cataracts removed; (2) dense central capsular opacity OU |
| 57 | C.B. | Yag Surgery -OS | 2/27/03 | Medcare | $523.23 | (1) still has decreased driving & reading visual acuity OS from 2nd cataract wants 2nd cataract removed OS; (2) vision 20/25+1 OD & 20/50 OS; (3) dense central capsular opacity |
| 58 | W.B. | Cataract Extraction -OD | 11/19/02 | Medicare | $779.58 | (1) vision 20/100 OD & 20/70 OS; (2) Dense central nuclear cortical cataracts |
| 59 | W.B. | Cataract Extraction -OS | 12/10/02 | Medicare | $779.58 | (1) vision 20/20 OD & 20/70 OS; (2) Dense central nuclear cortical cataracts |

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|---|---|---|---|---|---|---|
| 60 | W.B. | YAG Surgery -OD | 1/9/03 | Medicare | $394.04 | (1) has decreased visual acuity distance & near since last visit from 2nd cataracts Wants 2nd cataracts removed ASAP; (2) dense central capsular opacity OU |
| 61 | W.B. | Yag Surgery -OS | 1/16/03 | Medicare | $474.04 | (1) has decreased driving & reading visual acuity OS from 2nd cataract, wants 2nd cataract removed; (2) vision 20/20 OD & 20/50 OS; (3) dense central capsular opacity OU |
| 62 | I.L. | Cataract Extraction -OS | 3/18/03 | Medicare | $1,299.24 | (1) vision 20/100 OD & 20/70 OS; (2) Dense central nuclear cortical cataracts |
| 63 | I.L. | Cataract Extraction -OD | 3/25/03 | Medicare | $1,299.24 | (1) vision 20/100 OD; (2) dense central nuclear cortical cataracts |
| 64 | F.R. | Cataract Extraction -OD | 1/28/03 | Medicare | $1,298.38 | (1) vision 20/100 OD & 20/100 OS; (2) dense central nuclear cortical cataracts |
| 65 | F.R. | Cataract Extraction -OS | 2/4/03 | Medicare | $1,298.38 | (1) vision 20/80 OD & 20/100 OS; (2) dense central nuclear cortical cataracts; (3) decreased visual acuity driving and reading |
| 66 | F.R. | YAG Surgery -OD | 2/28/03 | Medicare | $474.04 | (1) can't read like I'd like has decreased visual acuity both eyes for TV & reading since last visit due to secondary cataracts. Wants secondary cataracts removed ASAP; (2) dense central capsular opacity OU |
| 67 | F.R. | YAG Surgery -OS | 3/7/03 | Medicare | $474.51 | (1) has decreased visual acuity reading & TV from secondary cataract, wants secondary cataract removed; (2) dense central capsular opacity OS |
| 68 | B.D. | Cataract Extraction -OD | 11/11/97 | Medicare | $1,458.69 | (1) not being able to see clearly, interferes with life, wants cataracts removed; (2) vision 20/100 OD & 20/50 OS; (3) dense central nuclear cortical cataracts |
| 69 | M.M. | Cataract Extraction -OD | 7/1/03 | Medicaid | $521.41 | (1) vision 20/100 OD & 20/100 OS |
| 70 | M.M. | Cataract Extraction -OS | 7/8/03 | Medicaid | $651.76 | (1) still has decreased driving and reading visual acuity OS due to cataract; (2) vision 20/100 OS; (3) dense central nuclear cortical cataract OS, wants removed ASAP |
| 71 | M.M. | Yag Surgery -OD | 7/17/03 | Medicaid | $593.14 | (1) has decreased reading and driving visual acuity since last visit due to secondary cataracts; (2) vision 20/70 OD & 20/70 OS; (3) dense central capsular opacity |

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|---|---|---|---|---|---|---|
| 72 | W.D. | Cataract Extraction -OS | 6/10/03 | Medicaid | $129.92 | (1) unable to see to drive safely at night due to cataracts. Wants cataracts removed ASAP & I can't stand the glare; (2) vision 20/50 OS; (3) dense central nuclear cortical cataracts |
| 73 | S.R. | Cataract Extraction -OS | 10/15/02 | Medicare | $518.80 | (1) can't see to read 2nd to cataract OS wants cataract removed; (2) vision 20/80 OD & 20/100 OS; (3) dense central nuclear cortical cataract |
| 74 | L.F. | Cataract Extraction -OD | 5/6/03 | Medicaid | $1,932.10 | (1) vision 20/100 OD & 20/50 OS; (2) dense central nuclear cortical cataracts |
| 75 | L.F. | Cataract Extraction -OS | 5/13/03 | Medicaid | $1,932.10 | (1) dense central nuclear cortical cataracts |
| 76 | L.F. | YAG Surgery -OD | 6/5/03 | Medicaid | $900.50 | (1) vision 20/100 OD & 20/70 OS; (2) dense central capsular opacity OU |
| 77 | L.F. | YAG Surgery -OS | 6/13/03 | Medicaid | $900.50 | (1) vision 20/70 OS; (2) dense central capsular opacity OS |
| 78 | F.P. | Cataract Extraction - OD | 3/27/01 | Medicare /Medicaid | $769.64 | (1) vision 20/50 -1 OD & 20/40 -1 OS; (2) dense central nuclear cortical cataracts. |
| 79 | F.P. | YAG Surgery –OD | 6/18/01 | Medicare /Medicaid | $467.04 | (1) vision 20/63 OD; (2) visual acuity decreasing from secondary cataract wants secondary cataract removed |
| 80 | F.P. | Cataract Extraction -OS | 6/3/03 | Medicare /Medicaid | $1,299.24 | (1) still has decreased visual acuity from cataracts wants cataract removed ASAP; (2) vision 20/20-1 OD & 20/100 OS; (3) dense central nuclear cortical cataract |
| 81 | F.P. | YAG Surgery -OS | 6/23/03 | Medicare /Medicaid | $593.14 | (1) has decreased visual acuity for reading and TV, wants secondary cataract removed ASAP; (2) vision 20/20 OD & 20/70 OS; (3) dense central capsular opacity OS |
| 82 | E.L. | Cataract Extraction -OD | 3/18/03 | Medicare | $1,219.24 | (1) vision 20/70 OD & 20/70 OS; (2) dense central nuclear cortical cataracts; (3) has decreased visual acuity reading from cataracts, wants cataracts removed |
| 83 | E.L. | Cataract Extraction -OS | 3/25/03 | Medicare | $1,219.24 | (1) vision 20/40-1 OD & 20/70 OS; (2) dense central nuclear cortical cataracts; (3) has decreased reading and driving visual acuity due to cataracts, wants removed ASAP |
| 84 | E.L. | YAG Surgery -OD | 6/30/03 | Medicare | $523.23 | (1) vision 20/100 OD & 20/70 OS; (2) decreased driving and reading visual acuity OU due to secondary cataracts, wants removed |
| 85 | E.L. | YAG Surgery -OS | 7/14/03 | Medicare | $524.68 | (1) vision 20/70 OS; (2) still has decreased driving and reading visual acuity OS from secondary cataracts, wants removed ASAP |

| Count | Patient Initials | False Claim (service billed) | Date of Service | Insurer(s) | Amount Paid | False Statements |
|---|---|---|---|---|---|---|
| 86 | R.S. | Cataract Extraction -OD | 1/28/03 | Medicare | $1,218.38 | (1) can't see to drive safely in glare, can't see to read, wants cataracts removed; (2) dense central nuclear cortical cataracts |
| 87 | R.S. | Cataract Extraction -OS | 2/4/03 | Medicare | $1,298.38 | (1) has decreased visual acuity driving & reading due to cataracts OS wants cataract removed ASAP; (2) vision 20/40-1 OD & 20/100 OS; (3) dense central nuclear cortical cataracts |
| 88 | R.S. | YAG Surgery -OD | 5/12/03 | Medicare | $523.23 | (1) has decresed driving and reading visual acuity since last visit due to 2nd cataracts wants 2nd cataracts removed ASAP; (2) vision 20/70 OD & 20/100 OS; (3) dense central capsular opacity OU |
| 89 | R.S. | YAG Surgery -OS | 5/28/03 | Medicare | $523.23 | (1) still has decreased reading & driving visual acuity OS from 2nd cataract, wants 2nd cataract removed; (2) vision 20/20 OD & 20/100 OS; (3) dense central capsular opacity OS. |

## COUNT 90 (UNJUST ENRICHMENT)

The United States and the State of Vermont repeat and reallege each and every allegation set forth in paragraphs 1 through 59 and counts 1 through 89 as if fully set forth herein.  Chase's conduct unjustly enriched him with federal and state monies which in good conscience he should not be allowed to retain.  Chase was unjustly enriched to the detriment of the United States and the State of Vermont.  Under the common law principle of unjust enrichment the United States and the State of Vermont are entitled to recover damages and prejudgment interest.

-26-

## COUNT 91 (<u>MISTAKE OF FACT</u>)

The United States and the State of Vermont repeat and reallege each and every allegation set forth in paragraphs 1 through 59 and counts 1 through 89 as if fully set forth herein.  The United States and the State of Vermont made payments on the claims submitted by Chase under the erroneous belief that the claims for payment were based on factually accurate representations that the claims submitted represented medically necessary services under Medicare, Medicaid, TriCare, and the FEHBP.  Had the true facts been known, the United States and the State of Vermont, through their carriers, would not have paid the claims presented by Chase for payment. Under the common law principle of mistake of fact the United States and the State of Vermont are entitled to recover damages and prejudgment interest.

## COUNT 92 (<u>BREACH OF CONTRACT</u>)

The United States repeats and realleges each and every allegation set forth in paragraphs 1 through 59 and counts 1 through 89 as if fully set forth herein.  As a result of conduct described in this complaint, Chase breached his contractual duties to federal and state funded health care programs by failing to submit claims that were medically necessary and failing to maintain records that were accurate and truthful.  Under the common law principle of breach of contract the United States and the State of Vermont are entitled to recover damages and prejudgment interest.

## <u>JURY DEMAND</u>

The United States and the State of Vermont demand trial by jury for all claims for which such jury is available.

## RELIEF REQUESTED

WHEREFORE, the United States and the State of Vermont request that the Court award judgment on its complaint and award as relief the following:

A.    Award the State of Vermont and the United States damages and prejudgement interest for its claims under the common law.

B.    Award the United States treble damages as is mandatory under the False Claims Act, 31 U.S.C. § 3729(a).

C.    Impose civil penalties payable to the United States of $11,000 for each false claim submitted to a federally funded health benefit plan pursuant to the False Claims Act, 31 U.S.C. § 3729(a).[4]

D.    Award the Plaintiffs its attorney's fees and costs of bringing this action.

Dated at Burlington, in the District of Vermont, on this 20th day of May, 2005.

Respectfully submitted,

UNITED STATES OF AMERICA

DAVID V. KIRBY
United States Attorney

By:    *Joseph R Perella*
JOSEPH R. PERELLA
Assistant U.S. Attorney
P.O. Box 570
Burlington VT 05402-0570
(802) 951-6725

---

[4] The minimum and maximum civil penalties contained in the False Claims Act, 31 U.S.C. § 3729(a) have been modified for those violations occurring after September 29, 1999. *See* Federal Civil Penalties Inflation Adjustment Act of 1990, Publ L. 104-410, 104 Stat. 890, *amended by* Debt Collection Improvement Act of 1996, Pub. L. 104-134, 110 Stat. 1321. The new minimum-mandatory civil penalty per claim is $5,500 and the new maximum civil penalty per claim is $11,000. *See* 28 C.F.R. § 85.3(a)(9) (adjustments to civil penalties).

STATE OF VERMONT

WILLIAM H.  SORRELL
Attorney General

By:

LINDA A.  PURDY
Assistant Attorney General
Medicaid Fraud and Residential Abuse Unit
103 S.  Main St.
Waterbury, VT 05671-1401
(802) 241-4442